F.I.L.E.D

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION 15 MAY 14  AM 11: 21

U.S. DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS, FLORIDA

CHRISTIAN AND MISSIONARY
ALLIANCE FOUNDATION, INC.,
et al.,

            Plaintiffs,

vs.                                CASE NO. 2:14-CV-580-JES-CM

SYLVIA MATHEWS BURWELL,                    Fort Myers, Florida
et al.,                                    January 23, 2015
                                           10:00 A.M.
            Defendants.
_____/


                    TRANSCRIPT OF PROCEEDINGS
               MOTION FOR PRELIMINARY INJUNCTION
             BEFORE THE HONORABLE JOHN E. STEELE
                  UNITED STATES DISTRICT JUDGE


APPEARANCES:

For the Plaintiffs:        CHRISTOPHER A. ROACH, ESQUIRE
                           STEPHANIE MARIE MARTIN, ESQUIRE
                           Adams & Reese, LLP
                           101 East Kennedy Boulevard
                           Tampa, Florida  33602

                           JUSTIN E. BUTTERFIELD, ESQUIRE
                           MATTHEW J. KACSMARYK, ESQUIRE
                           Liberty Institute
                           2001 West Plano Parkway, Suite 1600
                           Plano, Texas  75075


_____

                 MARTINA REPORTING SERVICES
                   The Courtney Building
               2069 First Street, Suite 201
                 Fort Myers, Florida 33901
          (239) 334-6545 / FAX (239) 332-2913



1                        A P P E A R A N C E S
                               (Continued)
2

3   For the Defendants:      BENJAMIN BERWICK, ESQUIRE
                             U.S. Department of Justice
4                            Civil Division
                             20 Massachusetts Avenue NW
5                            Washington, DC   20530

6
    Reported By:             PATSY L. COLEMAN, RPR, FPR
7                            Contract Court Reporter

8

9   _____

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          THE COURT:  All right.  This is the case of the

2     Christian and Missionary Alliance Foundation, Inc., and

3     others versus Sylvia Matthews Burwell and others.  It's

4     Case 2:14-CV-580.  We're set for oral argument on a

5     preliminary injunction request.

6          Counsel, let me have each of you identify

7     yourselves and your respective clients, beginning with

8     counsel for the plaintiff.

9          MR. ROACH:  Christopher Roach, Your Honor, of

10    Adams and Reese, LLP, for the plaintiffs; and I'm here

11    with some colleagues as well.

12         THE COURT:  You want the record to reflect who

13    they are?

14         MR. ROACH:  Yes, Your Honor.

15         THE COURT:  All right.  Go ahead.  They can do it.

16    They're lawyers.

17         MR. BUTTERFIELD:  Justin Butterfield.

18         MR. KACSMARYK:  Matthew Kacsmaryk, Deputy General

19    Counsel, Liberty Institute.

20         MS. MARTIN:  Stephanie Martin, also of Adams and

21    Reese.

22         THE COURT:  All right.

23         MR. BERWICK:  Good morning, Your Honor.  Benjamin

24    Berwick for the defendants.

25         THE COURT:  All right.  It's plaintiffs' motion.

1           MR. ROACH:  Thank you, Your Honor.

2           May we use the podium?

3           THE COURT:  Please.

4           MR. ROACH:  Christopher Roach, again, Your Honor,

5   for the Plaintiffs, Christian and Missionary Alliance

6   Foundation; Alliance Community For Retirement Living;

7   Alliance Home of Carlisle, Pennsylvania; Town and Country

8   Manor of the Christian and Missionary Alliance; Simpson

9   University and Crown College; all ministries and nonprofit

10  institutions affiliated with and -- with the Christian and

11  Missionary Alliance Foundation.  We're also with our

12  colleagues here today, some of whom may assist in rebuttal.

13          Plaintiffs are here today, Your Honor,

14  seeking preliminary injunctive relief because the Federal

15  government through the Affordable Care Act has mandated that

16  these ministries, the Christian and Missionary Alliance,

17  formally and materially cooperate in the dispensation of

18  abortion-inducing drugs and devices that terminate unborn

19  human life.

20          If these ministries do not comply, they suffer

21  potentially millions of dollars in fines and they face a

22  choice between paying these ruinous fines or violating their

23  sincerely held religious beliefs.

24          The law as applied to the Christian and Missionary

25  Alliance ministries that are plaintiffs in this action

1 | violates their sincerely held religious beliefs that are
2 | protected both by the Religious Freedom Restoration Act,
3 | also known as RFRA, and the First Amendment.  And they
4 | deserve, Your Honor, the same injunctive relief granted to
5 | the plaintiffs seeking relief in the vast majority of
6 | federal courts at every level.

7 | An injunctive relief has been provided in the
8 | companion Ave Maria and Ave Maria Law School cases here
9 | in the Middle District of Florida, as well as the EWTN
10 | case in the Eleventh Circuit where Judge Pryor wrote a
11 | concurrence.

12 | In both of these cases, as well as 31
13 | others, similarly situated plaintiffs objecting to the
14 | accommodations or to the mandate obtained an injunction
15 | protecting them from the full scope of the contraceptive
16 | and abortion mandates of the Affordable Care Act in
17 | accordance with their respective religious beliefs.

18 | THE COURT:  In how many of those cases was an
19 | injunction granted where the plaintiffs refused to certify
20 | in some fashion that they qualified?

21 | MR. ROACH:  I don't understand the question,
22 | Your Honor.

23 | THE COURT:  Well, in most of the cases, the
24 | Supreme Court of the Eleventh Circuit said the injunction
25 | is granted if the plaintiffs file a written notification

1  to HHS with the facts that would indicate they qualify for
2  an accommodation.  Here you're telling me you don't even
3  want to do that.

4          MR. ROACH:  That's correct, Your Honor.

5          THE COURT:  And my question is:  How many prior
6  cases has allowed a plaintiff to obtain an injunction
7  without telling the government that they qualify for an
8  accommodation?

9          MR. ROACH:  I believe that it's true in the Ave
10 Maria cases and I also know it's true, I believe, in the
11 Wheaton College case, which was issued one week after the
12 Hobby Lobby case in June of 2014, Your Honor.  And in
13 addition, injunctions have been obtained after Hobby Lobby
14 in several different cases, including Insight for Living
15 in the Eastern District of Texas, Your Honor.

16         THE COURT:  And you're telling me in those cases
17 the plaintiff was not required to tell the government that
18 they're a type of organization that qualifies for an
19 accommodation?

20         MR. ROACH:  I think the objection, Your Honor, in
21 fairness, goes beyond simply having to tell the government
22 that we object.  We've clearly told the government that we
23 object --

24         THE COURT:  I don't care what the objection is
25 beyond that.  I want to know if that's one of your

1   objections.

2          You may win on the other ones, but I'm having a
3   hard time with you saying that you don't even want to tell
4   the government that you're a qualifying entity.

5          MR. ROACH: We don't necessarily object -- the
6   problem with the accommodation, whether under the prior
7   iteration requiring Form 700 or the current iteration
8   requiring -- also known as the interim final regulation
9   issued in August of 2014 -- is that the requirements imposed
10  upon the plaintiffs go well beyond simply informing the
11  government that we object to the mandate.

12          They require the plaintiffs to inform the
13  government, indeed, that we object to the mandate, but
14  they also require the plaintiffs to inform the government
15  of the name of its third-party administrator. They require
16  the government -- they then set in motion a series of
17  events whereby a plan that was chosen by the plaintiffs
18  through a contractual arrangement with a self-insured and
19  a third-party administrator is then employed and used to
20  provide abortion --

21          THE COURT: Is there a secret about the identity
22  of the third-party administrator?

23          MR. ROACH: It wouldn't necessarily be known.
24  I don't know the answer to that, Your Honor, but it's not
25  so much that it's secret. It's that the government is then

1  commandeering that plan and the plaintiffs in their
2  sincerely held belief believe that they're not simply
3  informing the government that they object to this law --
4  anybody could tell the government I don't agree with this
5  law or I don't approve of this law -- it's that the
6  government is using the plaintiffs and that the plaintiffs
7  plans are then being used to provide abortifacients and
8  other abortion and -- abortion procedures to their
9  respective plan members.

10          THE COURT:  Well, you have to do more than tell
11  the government you object to the plan.  You have to certify
12  certain facts --

13          MR. ROACH:  That's correct, Your Honor.

14          THE COURT:  -- with regard to your client.  When
15  I say you, I mean your client.

16          MR. ROACH:  Understood, Your Honor.

17          THE COURT:  It has to certify certain facts,
18  the result of which is that presumably you'd be given an
19  accommodation.  As I understand what the objection is,
20  your client doesn't even want to certify those facts to
21  the government.

22          MR. ROACH:  It's not so much that -- I do believe
23  that the plaintiffs object to the fact that they would have
24  to certify -- they would essentially have to declare openly
25  their religious beliefs, but these particular plaintiffs

1  are not opposed and they've declared publicly their
2  opposition to abortion.  It's that this plan -- that they
3  view this series of activities connected to either the
4  Form 700 accommodation or the new interim regulation --
5  and so have 33 out of 39 federal courts that have looked
6  at this issue -- as a violation of their sincerely held
7  religious beliefs.

8         THE COURT:  I don't think 33 out of 39 have held
9  that certifying violates any statutory right.

10         MR. ROACH:  I believe that's correct, Your
11  Honor.  Some deal with the mandate directly and some deal
12  with the -- but some of them, including the most recent
13  cases out of the Eastern District of Texas, out of the
14  District Court of Oklahoma, out of the Tenth Circuit as
15  well, and also in the Korte case out of the Seventh Circuit,
16  these have all involved objections to not simply the mandate
17  but the accommodation.

18         And our view is that the injunctions were
19  rightfully granted to different similarly situated
20  plaintiffs whose sincere belief -- which the government does
21  not contest -- in objecting to the Form 700 accommodation,
22  we view that the interim final regulations changes to the
23  Form 700 accomodation are a distinction without a
24  difference.

25         In both cases it's our client's belief that they

1  are participating in, that they are giving sanction to,

2  that they are encouraging and that they are indirectly

3  supporting abortion, which they oppose, Your Honor, as a

4  sincerely held religious belief.

5          THE COURT:  And that's why the Supreme Court got

6  it wrong in the case -- relatively short case where they

7  granted the injunction if the plaintiff did certain things?

8          MR. ROACH:  Is that Hobby Lobby, Your Honor?

9          THE COURT:  No.  It was after Hobby Lobby, where

10 they indicated that the plaintiff had to certify but didn't

11 have to use the form and didn't have to notify anybody else.

12         MR. ROACH:  I wouldn't say they got it wrong,

13 Your Honor.  And the reason I would say that is, because

14 under RFRA essentially our job as a plaintiff is to show

15 that there's a substantial burden, which a great many cases

16 that -- certainly in connection with the mandate, but also

17 in connection with the prior accommodation, and further that

18 this substantially burdens a sincerely held belief.

19         The sincerely held belief in this instance is

20 not challenged.  The government does challenge whether the

21 indirect participation, essentially, in the creation of a

22 plan that then in turn funds abortion drugs is a substantial

23 burden.  We say it is and we do think that this question of

24 a substantial burden of sincerely held belief in this

25 instance overlap.

1           And the Supreme Court in Hobby Lobby, as well as
2  most recently in Holt versus Hobbs, a case that came out
3  this week involving prison regulations, counsels the courts
4  and counsels the government not to examine those beliefs
5  in the sense of essentially second-guessing and questioning
6  the beliefs.

7           This is the same argument, Your Honor, that the
8  government raised in reference to the mandate.  And in
9  reference to the mandate in Hobby Lobby, the government
10 said, well, what's the big deal?  You know, you, plaintiffs,
11 you're not providing -- you're not providing abortions; and
12 you, plaintiffs, you are not funding abortions.  It's your
13 insurer that has to do so and your insurer is doing so
14 through government law.

15          The government rejected that reasoning and took
16 the sincerely held belief that complying with the mandate
17 violated the plaintiffs --

18          THE COURT:  You mean the Court rejected that?

19          MR. ROACH:  Pardon me, Your Honor?

20          THE COURT:  You mean the Court rejected that?  You
21 said the government rejected that.

22          MR. ROACH:  The Supreme Court rejected that line
23 of reasoning urged by the government and which is urged by
24 the government again to defend the accomodation, and it is
25 urged by the government again to defend the interim final

1  regulation.

2  THE COURT:  Well, what acts is it exactly that
3  you want me to prevent the government from doing in this
4  case?

5  MR. ROACH:  In this particular case, Your Honor,
6  what we've asked for in our motion is to -- essentially to
7  shield the plaintiffs from having to comply with either --
8  with the mandate as it's applied to them requiring the
9  accommodation or compliance with the interim final
10 regulation.

11 They want to be able to provide healthcare to
12 their employees without having to fund abortifacients
13 drugs, without having to fund abortions, and without
14 having to participate indirectly in funding abortions by
15 complying with either the accommodation or the interim
16 final regulation, which they say is a violation of their
17 sincerely held belief.  And that they are then faced with
18 the substantial burden of either complying with that
19 sincerely held belief or facing ruinous fines.

20 THE COURT:  But it seems to me that most of
21 the courts have talked about that last part in terms
22 of the notification by the plaintiffs that they are a
23 qualifying entity.  That argument hasn't fared too well.

24 And it's kind of hard for me to understand how a
25 plaintiff can say, "I don't want to even tell the government

 1  that," and they're an employer.  And I suppose if I think

 2  back to other cases I had more frequently in this court, ADA

 3  cases, I mean they're saying as an employer they wouldn't

 4  have any problem with being sued by a disabled employee who

 5  never told them they needed an accommodation.  That doesn't

 6  seem right.  Certainly contrary to the disability law which

 7  requires a disabled employee to give the employer notice

 8  and request the accommodation.

 9          Why doesn't it make equal sense to have an entity

10  that wants to be -- to opt out, so to speak, at least tell

11  the government that, hey, we're a qualifying entity, our

12  religious beliefs say we can't do this.  End of story.

13  We're out.

14          MR. ROACH:  I guess I'd respond to that in two

15  ways, Your Honor.  Part of the reason the government, for

16  example, in Hobby Lobby, compares the mandate without the

17  accomodation to the mandate with the accommodation, is

18  that what the government needs to show, after we have

19  shown the sincerely held religious belief -- which is not

20  contested in this case -- and a substantial burden, is that

21  the government then must show that it has a compelling

22  interest and that it has employed the least restrictive

23  means, not simply a less restrictive means.

24          So in Hobby Lobby, for example, the government's

25  argument fell apart when the plaintiffs could say, for

1  example, "The mandate -- couldn't we have an accommodation
2  or couldn't we have a situation where the government paid
3  for these things directly through a voucher?" And if the --
4  when the government -- once this plausible alternative is
5  posited in response to the existing regime, you've shown
6  that it's not the least restrictive means.  So relative to
7  the mandate, the accomodation is arguably less restrictive.

8          And relative to the accommodation, however, a
9  great many policies already employed by the government in
10 furtherance of its general public health and equal access
11 to healthcare goals stated as their compelling interest
12 in this case, a great many of them show, number one, that
13 their compelling interest argument is not particularly
14 compelling because there's so many exceptions to the
15 Affordable Care Act.

16         Unions simply don't have to provide abortion
17 coverage at all.  Small businesses don't have to provide any
18 insurance coverage at all, necessarily, under the ACA; and
19 there's a great many other exceptions.  Grandfathered plans
20 are exempted under the ACA.

21         So it's hard to say it's a compelling interest
22 when you already allow millions and millions and millions of
23 Americans not to be given the same benefit that supposedly
24 must be applied against the plaintiffs in this case.

25         Secondly, the compelling interest argument in

1    this case has to be applied directly to the plaintiffs.
2    The government has to show that somehow their general
3    goals of public health and their general goals of equal
4    access to healthcare for women are going to fall apart
5    if they somehow exempt the relatively smallish number of
6    people covered under the different plans.

7           And then, finally, Your Honor, when there are
8    less restrictive means, some of which are already on the
9    table and some of which are conceivable, the government
10   cannot show that it has in fact employed the least
11   restrictive means.  For example, there are absolute
12   exemptions already for genuine churches.  The plaintiffs
13   want to at least get the same benefit as statutorily
14   defined churches; and they're not given that benefit now,
15   Your Honor.

16           Statutorily defined churches --

17           THE COURT:  And would they be willing to tell
18   the government that they're qualified?  I mean, you're
19   telling me they don't want to tell the government they
20   qualify as an entity that requested an accommodation.  Why
21   are we changing it to an exemption equal to a church?  I
22   mean, they still have to tell the government at some point
23   that, don't they?

24           MR. ROACH:  The objection is not -- this is not
25   a "for speech" argument.  We don't raise the "for speech"

1   First Amendment argument that we cannot tell the government
2   that we object.

3           What we object is to the differential treatment,
4   Your Honor.  Churches, church auxiliaries, grandfathered
5   plans, union plans, none of them have to provide the care --
6   the abortion services, rather, that the government is
7   mandating is going to be provided by the plaintiffs' plans.
8   The government -- the plaintiffs' plans have to provide
9   abortion or the plaintiffs are at risk for ruinous fines;
10  and that's what they object to.

11          Why can't they be treated the same as churches?
12  Why can't they, frankly, be treated the same as labor
13  unions?  Or, for that matter, why can't they be treated as
14  small businesses are treated in the wake of Hobby Lobby,
15  closely held corporations?  They're not subject to the
16  accommodation, nor are they subject to the interim final
17  regulation.  And yet --

18          THE COURT:  And what does a labor union or a
19  church have to do to come within the exemption?  Anything?

20          MR. ROACH:  They don't need to do anything,
21  because the mandate that would require the exemption simply
22  is not imposed against them at all.  So they can continue
23  to -- as our client's would like to, continue with their
24  pre-mandate plans, to continue with -- and more important,
25  they don't object, necessarily, to certain impositions of

1   the mandate with respect to healthcare, generally; but
2   they object, Your Honor, to the imposition of the mandate
3   of providing and creating plans and funding plans and
4   doing contracts and businesses and then in turn alerting --
5   setting in motion a series of events that alerts their
6   employees and their third-party administrators of their
7   plans of how to get abortions and how to get abortion drugs.
8   That's what the government is making our client's do under
9   the penalty of fine.

10          And with respect to the preliminary injunction,
11  we're simply asking relief from this imposition until this
12  matter can be determined on the merits, Your Honor, to be
13  determined fully on the merits, after a final resolution
14  of this matter on appeal, along with all the sister and
15  companion cases that are presently pending on appeal, along
16  with EWTN's case that is pending before the Eleventh Circuit
17  on appeal.

18          And we simply want relief from what our clients
19  consider a substantial imposition, because our clients, as
20  the current law is presently written, either have to comply
21  with this and set in motion what they believe is a series of
22  events that lead to a grave sin of abortion, or pay ruinous
23  fines that would probably put them out of business.

24          Shell Point, one of the plaintiffs in this case,
25  has a little over a thousand employees.  They face $100 a

1   day fine from the government.  It's $100,000 a day that
2   they would have to pay, potentially, simply to exercise
3   their conscience, Your Honor.  That's not the American
4   way.  That's not what RFRA requires of the government.
5   RFRA requires a searching inquiry.  RFRA requires a
6   particular showing of compelling interest; and most
7   important in this context, Your Honor, RFRA requires
8   that the government employ the least restrictive means.

9           They've used less restrictive means, in our
10  opinion, in actual examples of churches and church
11  auxiliaries.  The government suggests in Hobby Lobby
12  that direct subsidies to any uses would be a less
13  restrictive means and also the most logical.

14          And finally, Your Honor, there is other
15  alternatives which their clients, to be clear, do not
16  endorse as a policy or as a moral matter, but they do
17  endorse them insofar as they show that there are less
18  restrictive means.

19          If the government were to provide vouchers for
20  specific abortifacients where if a patient went to the
21  pharmacy and said, "I want Plan B, I want this drug that
22  will destroy an unborn child," and pharmacy would say,
23  "I'm sorry.  It's not covered by your plan, but here from
24  the HHS is a voucher."  The plaintiffs don't sully their
25  hands with the dirty business of abortion, Your Honor, and

1  also the government uses a more efficient and less
2  restrictive means.

3         But most important -- we're not advocating this
4  as a policy, but what these different alternatives show,
5  Your Honor, is that there are less restrictive means.  The
6  government hasn't used them and that is dispositive under
7  RFRA, Your Honor.

8         The government cannot win if we show even one
9  less restrictive means.  That's why the accommodation
10  relative to the mandate before the accommodation showed
11  that the original mandate did not meet the RFRA test.

12         We are saying that these other alternatives, the
13  grandfathered plans, vouchers, ACA exchanges, a single-payer
14  system even, all of these show that the accommodation as
15  currently written doesn't pass muster under RFRA, Your
16  Honor.  RFRA is a demanding test.

17         The government's raised this kind of argument
18  before.  Essentially, what's the big deal?  Someone else
19  is paying for it.  That was the argument that they raised
20  vis-a-vis Hobby Lobby, Your Honor.  But the Supreme Court
21  rejected that argument, because the Supreme Court took at
22  face value -- the Supreme Court took at face value the
23  plaintiffs' contention that they view that as an indirect
24  participation in abortion.

25         We say that the interim final regulation as

1    written and the accommodation as it was previously written
2    and numerous courts have issued injunctions on to protect
3    similarly situated plans, we argue that both of those
4    similarly -- perhaps not as dramatically, but similarly
5    involve our clients in the business of providing abortions
6    and paying for abortions and facilitating abortions in some
7    manner, and they object to it.  The sincerity of that belief
8    is not objective, Your Honor.

9            I don't understand how the government could
10   possibly argue there's not a substantial burden.  The Court
11   in Hobby Lobby thought that the fines of the mandate were
12   a substantial burden.  The Eleventh Circuit in EWTN, under
13   Judge Pryor's concurrence, noted that those fines are an
14   obvious substantial burden.  The Eastern District of Texas
15   in the last two weeks, I believe, found that -- in Insight
16   for Living, that those fines were a substantial burden.

17           And while it's true, we concede, that the D.C.
18   Circuit in Priests for Life found against similarly situated
19   plaintiffs raising an argument such as we're raising, the
20   Tenth Circuit in this past week -- and also as noted in our
21   supplement -- found in favor of similarly situated plans,
22   Your Honor.

23           THE COURT:  Is it your view that the pending
24   Eleventh Circuit case will decide these issues?
25           MR. ROACH:  I believe so, Your Honor.

1          THE COURT:  So, basically whenever they get
2     around to deciding the case, we'll know the answer.  Is
3     that what will govern this case, at least until someone
4     files a petition for cert and it's granted?

5          MR. ROACH:  That's correct, Your Honor.  And
6     we simply want to maintain -- the government challenges,
7     essentially, whether we are maintaining the status quo.
8     The government assumes -- wrongly assumes and I would
9     represent to the Court that our clients are now directing
10    their TPA's and are now paying for this type of coverage.
11    But what we simply want to do is to be given the same --
12    to be given a reprieve, to be given the same protection
13    pending final resolution of this matter by the Eleventh
14    Circuit and also by the Supreme Court, in order to do --
15    you know, to do what the plaintiffs think is right, which
16    is to provide healthcare to their employees and to try
17    their best to adhere to government regulations in doing
18    so, but to not do so in a way that facilitates abortion.
19    That's the problem.

20         The government puts plaintiffs, such as the
21    plaintiffs in this case, these Christian and Missionary
22    Alliance ministries, puts them in a difficult position,
23    Your Honor.  They want to provide healthcare to their
24    employees, but they don't want to directly or indirectly
25    be involved in the business of abortion.

1           So they have several options.  They can drop
2    their health plans and pay fines for doing so.  They
3    can -- I believe 2,000 a year per employee.  They can
4    provide the healthcare without providing these mandatory
5    abortifacients and mandatory abortion procedure coverage,
6    and to do so it faces -- to do so without doing that, it's
7    going to eventually run into issues with its third-party
8    administrators and other third-party insurers to the extent
9    that they're using.

10          They can exercise civil disobedience and
11   recognize -- and risk ruinous fines, or what can happen --
12   and what we urge the Court to do in this case -- is to
13   provide them the protection while this litigation is
14   ongoing in the form of a preliminary injunction.

15          The biggest problem, Your Honor, the biggest
16   problem with the government's argument here is they have
17   not -- they don't meet their burden.  They don't argue one
18   of the elements that the plaintiffs must show with respect
19   to this, the sincerely held belief.  They simply don't
20   contest that in this case, Your Honor.  And I think if
21   Your Honor looks at our complaint, looks at Paragraph 7
22   of our complaint, looks at the public statements of CMA
23   ministries, it's really incontestable in this case.

24          Secondly, though, they do argue that it's a
25   substantial burden, but the problem is the sincerely held

1  belief as defined definitely runs into the substantial
2  burden of fines. And the Court, at least in Hobby Lobby,
3  found it laughable to say that, you know, $100 a day per
4  employee -- $100,000 a day in the case of the Shell Point
5  Company, Your Honor -- the Shell Point Ministry, rather --
6  to say that that's not a substantial burden. So once we
7  show that, then the government has a burden, which they
8  cannot meet in this case; and I would like to discuss that,
9  if I may, Your Honor.

10          In the last week, Holt versus Hobbs, a Supreme
11  Court case involving prisoner rights, in a particular --
12  in a RFRA challenge to a prison regulation that required
13  prisoners to shave their beards, essentially. The
14  government was concerned with contraband. The petitioner
15  was a Muslim who believed it was his religious duty to
16  maintain a beard, and the Arkansas Prison Division
17  challenged that, Your Honor. The Supreme Court in a
18  unanimous opinion granted the RFRA challenge.

19          Now, there, in the abstract, it's undeniable
20  that prisons have an interest in safety, that prisons have
21  an interest in discipline, that prisons have an interest in
22  removing contraband. And we would concede, Your Honor,
23  that it's undeniable as a general matter that public health
24  is a good thing. Whether it meets the compelling interest
25  test is different from this. It's at least arguable that

1  public health is a compelling government interest; that
2  equal access to healthcare is generally a compelling
3  government interest.

4        What the government cannot show, however, is
5  that the -- in order to achieve -- they must achieve
6  those interests in every single case, every single time.
7  And that was essentially the argument that was persuasive
8  to the Supreme Court, which, as you say, Arkansas prisons --
9  that prison discipline is very important and people can't
10  have beards in order to further that goal.

11        However, in that case, Your Honor, they did
12  permit beards of a certain length for medical reasons when
13  people have, for example, a skin condition where they're
14  required to have a beard and, in addition, they allowed
15  longer hair, up to two inches, I believe, on the heads of
16  prisoners; and somehow the hair on the beard would permit
17  contraband, the hair on the head wouldn't.

18        It's laughable, Your Honor, and we suggest that
19  it's similarly laughable and it's similarly unpersuasive,
20  more accurately, to say that the government needs to
21  impose -- the government needs to impose this requirement
22  of providing abortion coverage on the Christian and
23  Missionary Alliance ministries, but they don't know need
24  to impose it on labor unions and they don't need to impose
25  it on statutorily defined churches and they don't need to

1    impose it on church auxiliaries and they don't -- and
2    that they can't use some other means to get the Christian
3    and Missionary Alliance ministries out of the business
4    of indirectly providing abortion by setting in motion
5    the series of notifications that ultimately lead to
6    their members of their perspective health plans getting
7    abortifacients drugs and getting access to abortion,
8    Your Honor.  So that is the difference.

9         First of all, their compelling interest
10   argument fails because when you have that many holes
11   in this alleged uniform plan where you must -- where the
12   government's to seamlessly provide coverage and yet the
13   seams are enormous, Your Honor, to the point where this
14   entire alleged seamless plan looks like ten different
15   pieces of fabric.  There's a great many exceptions.

16        They do not sunset, as suggested by the
17   government in their brief.  There's no necessary sunset
18   to any grandfathered plan and, more important, there
19   is a complete exemption and we want the same complete
20   exemption as churches and church auxiliaries.

21        They are treated differently under the statute
22   than these nonprofit ministries.  We say that that's unfair,
23   Your Honor; but we say, more important, that shows the
24   government cannot prove a compelling interest.

25        And finally -- and there is some overlap, I

1  concede, between these different ideas.  Just as our
2  sincere belief -- the concept of our sincere belief and a
3  substantial burden overlap to some extent in this case,
4  the compelling interest and the least restrictive means
5  analysis also overlap in this case.

6          On the one hand all these exemptions call into
7  doubt the government's claim that it has a compelling
8  interest in applying the ACA to these plaintiffs here,
9  Your Honor, in a manner that requires them to participate
10 in the business of abortion.

11         On the other hand, Your Honor, the fact that
12 there are these different exceptions for unions, for
13 churches, for church auxiliaries, plus there are at least
14 conceivable vouchers, the much vaunted healthcare exchanges
15 and a great many other avenues by which individual people
16 could get abortion drugs, but what they wouldn't do so
17 by commandeering, by involving and by burdening the
18 consciences of people who feel that using their health plan
19 and notifying the government to use their health plan to
20 provide abortion drugs, which is what the Form 700
21 accommodation requires and it is also what the interim
22 final regulation requires.  We argue that the interim final
23 regulation is a distinction without a difference, Your
24 Honor.

25         In the past, under the Form 700, they could ---

1    the companies such as the plaintiffs, ministries such as
2    the plaintiffs, would have to notify their plans directly.
3    Now they get to notify HHS, who in turn presumably
4    immediately routes that form back to the plan.  Their plans
5    are still commandeered and the sincerity of their belief
6    that that action is participation in a grave evil that they
7    are indirectly, formally and materially cooperating with an
8    outcome that violates their deepest held beliefs.

9            It's exactly the type of thing that RFRA is
10   designed to prevent, RFRA is designed to protect the
11   plaintiffs from, and that's the kind of protection we're
12   asking from -- even just on a preliminary basis, Your Honor,
13   until this can be resolved by the Eleventh Circuit.

14           THE COURT:  Are the plans that your clients have
15   governed by ERISA?

16           MR. ROACH:  ERISA?  I don't know, Your Honor.
17   I can't speak to that.  They may be.  I just don't know.  I
18   can probably consult with my co-counsel to resolve that.

19           THE COURT:  I mean, I guess I'm assuming they are
20   unless you tell me otherwise.

21           MR. ROACH:  Apparently they are, Your Honor.
22           THE COURT:  I see counsel nodding his head
23   affirmatively.

24           All right.
25           MR. ROACH:  I would like to explicate, if I may,

1    Your Honor, our clients' view of the revised accommodation
2    and our clients' view why it also violates their sincerely
3    held belief.

4         The interim final rule does not alter the
5    substantial burden analysis because it still requires
6    these Christian and Missionary Alliance ministries to
7    formally and materially cooperate with the Federal
8    government's abortion manual and, for example, they must
9    provide HHS the name of the eligible organization, which
10   is their own name, the basis for the eligibility of the
11   accommodation, the objection based on sincerely held
12   religious beliefs, identify the subset of contraceptive
13   services that are objectionable, plan name, plan type, name
14   and contact information for third-party administrators,
15   name and contact information for health insurance issuers,
16   mandatory notice if there is any change in the future.

17        So this is a burden in the front end, this is
18   an ongoing burden for the plaintiffs, and more important,
19   if -- I guess that one way to look at it from their moral
20   beliefs is if they were not to do this, then the plan
21   would not necessarily ever be able to provide anyone with
22   abortifacients or anyone with abortion coverage.  But by
23   doing so, they are the but-for cause of what they consider
24   as grave evil.

25        The government also promulgated the new interim

1 | final revocation in August of 2014 after Form 700 had been,
2 | I guess, ruled against by so many different court opinions
3 | or at least subject to injunctions in so many. But we would
4 | argue, Your Honor, at least on its face it appears more
5 | burdensome.

6 | It seems to me typically easier to fill out a
7 | preprinted form than to hire attorneys, to spend some time
8 | articulating exactly how one wants to articulate one's
9 | beliefs, to prepare a form from scratch, which is what the
10 | interim final regulation requires. It does not require the
11 | hiring of attorneys, but when you're dealing with the
12 | intersection of deeply held beliefs and a government
13 | increasingly try to commandeer and to maroon private people
14 | into providing abortion and abortion coverage, we would
15 | argue, Your Honor, that the new form -- the old accomodation
16 | didn't pass muster. There's no basis on which the new
17 | accommodation passes muster.

18 | The mere fact that the communications use an
19 | intermediary in order to get to the plan and to the get
20 | to the plan administrators we argue is a distinction
21 | without a difference, and that simply in terms of the
22 | time and energy involved and, more importantly, the moral
23 | impact and the moral cost of complying with the interim
24 | final regulation constitutes a substantial burden. And
25 | noncompliance most obviously constitutes a substantial

1  burden because it imposes ruinous fines that would destroy
2  similarly situated companies as the -- ministries as the
3  plaintiffs as well as the plaintiffs themselves.

4          Finally, Your Honor, I would like to address
5  something that I guess arose in some of the briefing
6  of the government, which is there's a suggestion that
7  somehow plaintiffs have waived -- they've waived their
8  First Amendment Rights of religious freedom.  It's a bold
9  argument by the government.

10          THE COURT:  I missed that one.

11          MR. ROACH:  I believe that it appears in their
12  reply brief.

13          But the government's argument is because these
14  plans came into being in January 1 of 2014, and some
15  may -- the government assumes, I would represent that they
16  are not -- but because some of them may have to comply
17  under duress with the ACA, that the government -- the
18  plaintiffs failure to earlier seek an injunction somehow
19  waives their right of injunction and showing of irreparable
20  harm.

21          THE COURT:  I do remember that.

22          MR. ROACH:  There's a real -- there's several
23  major problems with this argument, Your Honor.  First of
24  all, a RFRA violation is always an irreparable harm, Your
25  Honor.  That is the Eleventh Circuit, found in Midrash

1    Sephardi versus Surfside, which was cited 366 F.3d 1214.
2    Sherbert versus Verner, and most recently in the Supreme
3    Court in Holt versus Hobbs, which came out this last
4    week -- that's the prison case -- has reiterated the
5    search again required under RFRA and the general principle
6    that a RFRA violation and the showing of some likelihood --
7    a substantial likelihood of success on the merits is the
8    sufficient -- that alone is sufficient to grant a
9    preliminary injunction.  Because all these different
10   concepts -- public interest, irreparable harm, success
11   on the merits and weighing the equity as between the
12   plaintiff and the defendant -- they all overlap under
13   RFRA.

14          If you can show that something violates RFRA and
15   you want to be protected from it, or at least you have some
16   likelihood of success on the merits -- we're all waiting for
17   the Eleventh Circuit ruling -- that is enough under RFRA.

18          Secondly, the government cites a number of
19   different cases that are not First Amendment or RFRA cases.
20   The government, for example, cites a copyright case, Calhoon
21   versus Lillenas Publishing.  It cites another case, Fund for
22   Animals versus Frizzell, that involved an environmental
23   group that waited too long -- while certain birds were being
24   harvested and hunted, it waited too long and therefore it
25   was an indisputable delay in the seeking of injunctive

1    relief.

2           In Mylan Pharmacy versus Shalala, the Court noted
3    that it was only a case of economic harm and the Court also
4    stated that delay is not dispositive.

5           Finally, in Tough Traveler versus Outbound
6    Products, this had to do with a consumer rights claim.
7    Most important, none of these are First Amendment claims.
8    There's a great number of cases, Your Honor, that talk
9    about the high protection afforded the person under the
10   First Amendment and the even higher protection afforded
11   to clients under RFRA.

12          We're RFRA plaintiffs, we're also First Amendment
13   plaintiffs here and the Court -- and the case law, rather,
14   demands a search and inquiry by the Court, a severe testing
15   of the government's -- we would argue -- unsustainable
16   claims of compelling interest in this case due to the
17   numerous exceptions and, equally, their unstainable claims
18   that they have used the least restrictive means, when there
19   are, in fact, even less restrictive means, some of which are
20   currently employed, such as the application of the ACA in
21   churches and church auxiliaries and labor unions, and some
22   that are conceivable.

23          One of the things that the Court in Hobby Lobby
24   and that the Court also in Holt versus Hobbs case, is that
25   our job is not simply to take what the government has

1    offered off the rack.  You know, if there is a less
2    restrictive means, it needs to be used.  That's the mandate
3    of RFRA.

4            It is a costly mandate and the majority in Hobby
5    Lobby takes note of this, and it also notes that that is
6    an argument raised in the dissent.  Essentially the
7    argument being, if we do this now, we're go to have so
8    many plaintiffs coming in and complaining about everything
9    under RFRA.  And the majority in Hobby Lobby recognizes
10   that.  The majority in Hobby Lobby simply says that is the
11   mandate of Congress under RFRA, and Congress would have to
12   change that, because the language of RFRA is unmistakable
13   in that regard.

14           And finally, Your Honor, as to the merits, if I
15   may return to irreparable delay, the third point.  As to the
16   merits that the plaintiffs delayed, we would argue that the
17   plaintiffs moved here -- the plaintiff ministries moved with
18   alacrity.  If they moved too early, they risked extensive
19   and inconvenient dismissal of the right to.

20           Now the government, in early 2015, complains
21   of plaintiffs waiting too long.  In 2013 the government
22   raised the opposite point while the accommodation was
23   pending in EWTN versus Sebelius in the Northern District
24   of Alabama and in Ave Maria versus Sebelius here in the
25   Middle District of Florida.  This is before the Eleventh

1 | Circuit, both, and the Middle District rulings on the
2 | merits.

3 | When the accommodation was pending and there
4 | was a notice of rulemaking, the government said, "It's not
5 | ripe. It's too early. Perhaps you'll be accommodated by
6 | the accomodation." Now, here we have a similar situation.

7 | The accomodation was issued in June of 2013, but
8 | Hobby Lobby came out in June of 2014. The plaintiffs here
9 | did not fully comply with this big piece of the mandate, we
10 | would argue, Your Honor, and, more important, attempted to
11 | resist it. At the same time, Your Honor, they waited
12 | hopefully for the Court's ruling in Wheaton College and they
13 | waited hopefully for the Court's ruling in Hobby Lobby.

14 | After Hobby Lobby in July of 2014, July 22nd,
15 | the government said, "In a month we will provide an interim
16 | final regulation," trying to address the complaints of
17 | companies like -- of ministries and non-profits and people
18 | such as the plaintiffs here.

19 | In August 27th of 2014, the interim final
20 | regulation arrived. It was not satisfactory to the
21 | plaintiffs. It still required them to participate
22 | indirectly in the provision of abortions. It still
23 | provided -- required them indirectly to provide -- to
24 | participate in the funding of abortions by others. And
25 | all of these participations in an act that they find gravely

1  evil they objected to.

2          Less than a month later their boards met.  We're
3  dealing here, Your Honor, with I believe six different
4  plans.  Their boards met and authorized this action which
5  was filed in October of 2014.

6          I would submit to the Court, Your Honor, that when
7  a law is challenged that is promulgated -- or regulation in
8  this case is challenged, when it is promulgated on August
9  27th of 2014, and suit is filed on October 2nd of 2014,
10  that that is lightening fast in the field of litigation.
11  I've engaged in a lot of civil litigation, Your Honor, and
12  very rarely does anyone move so fast.

13          But secondly, Your Honor, I would argue that the
14  government is simply grasping at straws insofar as when
15  regulations were pending in the form of the original Form
16  700 accomodation, they challenged people that came to early,
17  before the regulation was promulgated.  Now they challenge,
18  for instance, people that challenged any regulation within a
19  month after it's promulgated.

20          It's not the case, Your Honor, that when -- when
21  you're dealing with a First Amendment harm or a RFRA harm,
22  that you have this tiny window in which to act.  RFRA and
23  First Amendment harms are ongoing harms.  Showing that a
24  RFRA harm is underway is proof of irreparable harm and it
25  is proof similarly of a likelihood of success on the merits

1    on seeking a preliminary injunction.

2         But it's not the case that you have to act now or

3    forever hold your peace.  And I think that the best example

4    of that is probably the plaintiff in Holt versus Hobbs.

5    This prisoner who under duress shaved his beard on several

6    occasions eventually got the courage and the legal knowledge

7    and wherewithal to actually challenge it.  The government

8    did not argue that because he had once complied with this

9    offensive regulation, now he must comply with it forever and

10   cannot seek an injunction and cannot seek relief.

11        And that's essentially what the government is

12   saying here, Your Honor.  Their argument is that if the

13   plaintiffs or anybody under duress complies with the ACA

14   and the abortion provisions of ACA, and if they comply with

15   that for any period of time, they must then comply with it

16   for all times.  The law does not require that, Your Honor.

17        The law recognizes the especially high protections

18   of RFRA plaintiffs and of RFRA claimants; and, secondly,

19   Your Honor, the law, while it does recognize the general

20   principles of ripeness and it does recognize the general

21   principal of laches or statutes of limitation, here we would

22   argue that -- the argument that when we are challenging,

23   we are challenging the interim final regulation, we are

24   challenging the mandate to the extent it incorporates that

25   into the accommodation or the interim final regulation.

1   And the idea that waiting five weeks and two days to

2   challenge this particular regulation does not show

3   irreparable harm, we frankly think is not a -- is not

4   an argument that should persuade the Court.

5          If I may conclude, Your Honor, the plaintiffs

6   here are seeking a preliminary injunction.  To do so we

7   have to show compliance -- or rather show that we have a

8   likelihood of success on a Religious Freedom Restoration

9   Act claim.  Here we say, Your Honor, that the Religious

10  Freedom Restoration Act does provide us relief.  We have

11  shown a substantial burden in the form of the fines.  The

12  same burden's recognized by courts nationwide.

13         Further, Your Honor, we have shown a sincerely

14  held belief.  This belief is manifest on our client's

15  website, it's manifest in their policies, it's manifest

16  in what I would represent to the court by their attempts

17  to avoid imposition of this part of the mandate, even after

18  their plan years began in 2014.  The government on which --

19  a position on which the government has no evidence to the

20  contrary.

21         And on the other side of the ledger, on the other

22  side of the scales, we would argue that the government

23  cannot show a compelling interest.  They cannot show a

24  compelling interest because of the numerous exemptions

25  that they have already provided to others under the ACA.

1  They cannot show the lack of a compelling interest in this
2  instance, Your Honor, because of the fact that when others
3  are exemptible, why does it have to be imposed upon
4  ministries of the Christian and Missionary Alliance.  Why
5  does a labor union get an exemption, but not the Christian
6  and Missionary Alliance.

7          And then, finally, the 4 arguments
8  are all generic.  They're -- just as the prison cannot
9  simply state we can keep this beard regulation because
10  we're generally concerned with prison safety -- which is
11  something they should be concerned with -- likewise the
12  government cannot succeed here by saying we are generally
13  concerned with public health and we are generally concerned
14  with women's health and we are generally concerned with
15  the equal provision of that healthcare.

16          None of those things show that there is a
17  compelling interest to impose the mandate and the interim
18  final regulation against the plaintiffs here.  None of
19  those things show that.  Even if we were completely
20  exempted from the mandate, from the ACA, from the interim
21  final regulation, the government cannot show a compelling
22  interest to apply it against the plaintiffs or parties
23  situated similarly to the plaintiffs.

24          And when you've already exempted millions and
25  millions of Americans from the ACA -- which the government

1  has, that's undeniable, and I believe it's by their own
2  admission -- when that's already occurred, you can't state
3  that the several hundreds and maybe several thousands of
4  employees and students represented by the plaintiffs in
5  this case have to have this and they have to have it and
6  all of the particulars or somehow the entire plan will
7  fall apart.

8          The enormous AFL-CIO and its millions of employees
9  can be exempted from the ACA and the plan won't fall apart,
10 and small employers with 50 or fewer employees don't have to
11 provide this kind of care nor do they have to jump through
12 the various hoops of the accommodation; and that's a great
13 number of employers in this country.  They don't have to do
14 it, but somehow the Christian and Missionary Alliance
15 plaintiffs do.  We argue that that -- we would say, Your
16 Honor, that that argument is not persuasive and that, in
17 fact, it shows the lack of compelling interest.

18          And then, finally, Your Honor, with respect to
19 the precedent and to the precedent of Hobby Lobby and
20 related cases on which the government relies in its
21 arguments, we would say, Your Honor, that those various
22 cases -- for example, the Hobby Lobby and the essential
23 thought experiment that says, well, relative to the mandate,
24 this particular accommodation seems to show something less
25 restrictive.  That's not the end of the story.  That is

1  simply an argument that shows the lack of compliance of
2  that mandate with RFRA.

3        If someone were later to come along -- which we
4  believe we have in this instance -- and say, okay, that
5  accommodation may show a problem in the mandate, but we
6  show by pointing to the grandfathering, by pointing to the
7  treatment of churches and church auxiliaries, by pointing to
8  the treatment of labor unions, by pointing to the treatment
9  of small businesses, we would argue that treatment of all
10 those entities and also by the possibility of vouchers, ACA
11 exchanges and potentially an all entirely new program, a
12 government-funded program in its entirety, the possibility
13 of those things and the existence of some of those things
14 now, shows the least restrictive means is not presently
15 being employed.

16        Finally, Your Honor, as we've argued with respect
17 to irreparable harm, our plaintiffs are here to say to the
18 Court and to the Federal government that this irreparable
19 harm, that this is a grave moral error and that they want
20 to have nothing to do with it.

21        And at the very least what we're here to ask for
22 today is protection from the imposition of that burden till
23 a resolution of this matter by the Appellate Court and by
24 the Supreme Court.

25        Thank you, Your Honor.

1          THE COURT:  I do have another question for you.

2          MR. ROACH:  Yes, Your Honor.

3          THE COURT:  With regard to the burden you have

4  seeking a preliminary injunction, your memorandum cites

5  pretty standard language from the Eleventh Circuit.  That

6  language leads to verbiage that is different than the

7  standard articulated by the Supreme Court.

8          Is it your view that the Eleventh Circuit standard

9  is different or that it's just a matter of different

10  verbiage?

11          MR. ROACH:  I think it's a matter of different

12  verbiage.  If you could perhaps let me know what -- which

13  words are missing or were added to our articulation.

14          THE COURT:  Sure.  The Supreme Court -- in the

15  listing of the four factors, the Eleventh Circuit talks

16  about substantial likelihood of success, the Supreme Court

17  does not use the word "substantial".

18          As to the second element, the Eleventh Circuit

19  talks about requiring -- plaintiff must show that it will

20  suffer irreparable harm; the Supreme Court says that it

21  will likely suffer irreparable harm.  So one of those is

22  more substantial, arguably, and one is less substantial,

23  I guess.

24          MR. ROACH:  I don't know if these are just

25  different -- if they have real meaning in terms of how

1   the Court should go about --

2          THE COURT:  That's my question, whether it's
3   just verbiage difference or --

4          MR. ROACH:  I believe it's probably verbiage
5   difference.  If it were a higher standard, we believe we
6   meet that higher standard.

7          I guess we would also -- I don't believe there
8   are two different standards.  I should start with that.
9   Because the whole four elements of the preliminary
10  injunction standard I believe were all derived from Rule 58.

11         THE COURT:  Well, the Supreme Court would
12  presumably know that, too.

13         MR. ROACH:  Fair enough, Your Honor.

14         THE COURT:  But --

15         MR. ROACH:  I don't believe there's a substantive
16  difference.  I believe to the extent there might be gray
17  area of two cases -- or one case viewed under the two
18  standards, we believe we meet the higher standard and we
19  believe we've shown that to the Court as well.

20         THE COURT:  All right.  Thank you.

21         Mr. Berwick?

22         Why don't you start off by telling me why it
23  doesn't just make sense, even if I don't buy anything he
24  says, that I just wait and let the Eleventh Circuit decide
25  the case they have and why are we spinning our wheels?

1          MR. BERWICK:  So, Your Honor, I think I have a
2    couple of responses to that.  First of all, in order for
3    this Court to grant preliminary injunctive relief, the
4    Court would have to find that they meet the requirement
5    for preliminary injunctive relief.  That is, that they
6    have shown that they are -- the plaintiffs are likely to
7    succeed on the merits and their irreparably harmed and they
8    meet the other factors.

9          So I don't think the Court can just issue a
10   preliminary injunction because it would be convenient to
11   do so.

12         THE COURT:  Can I issue a stay?

13         MR. BERWICK:  A stay -- well, I don't know what a
14   stay would do, Your Honor.

15         THE COURT:  A stay would tell you people to stop
16   working.

17         MR. BERWICK:  We could stop working, but --

18         THE COURT:  Why spend money on something that
19   you're going to get my opinion and then in a month my
20   opinion's isn't going to matter because the Eleventh
21   Circuit is going to say what the real answer is from
22   their perspective.

23         MR. BERWICK:  Yes, Your Honor, you could
24   certainly stay this case; but if the case were stayed,
25   in the meantime the requirements would still apply to

1  the plaintiffs unless the Court actually enjoined the
2  application of the regulations to plaintiffs.

3         THE COURT:  Well, they apply now and they suggest
4  that they've not complied --

5         MR. BERWICK:  Yeah.

6         THE COURT:  -- and where do you think that the
7  government has done anything because of it?

8         MR. BERWICK:  So that's a good question, Your
9  Honor.  Yeah, I mean if it is true that they are not
10  complying, of course they could continue to not comply
11  with the law and potentially suffer the consequences of
12  that.

13         I should say that we have said in our initial
14  brief that we were -- presumed that they were in fact
15  complying with the law.  I thought they had suggested --
16  it wasn't clear from their complaint, but I thought it was
17  at least suggested that the plans -- that their plans
18  currently are providing this contraceptive coverage.

19         In fact, in their reply brief they said --
20  if you'll give me a moment, Your Honor -- they said,
21  "Unfortunately, without an injunction in place, plaintiffs
22  are presently being forced by the government to violate
23  their sincerely held religious beliefs."

24         So we had understood that to me mean that they
25  are currently providing this contraceptive coverage or their

1   plans are currently providing the contraceptive coverage
2   sort of over their objection.

3        Of course, they can -- plaintiffs' counsel can
4   correct me if that's wrong.  But that was why we argued,
5   Your Honor, that an injunction would, in fact, change the
6   status quo, which makes this case different from EWTN and
7   the Ave Maria cases.  In fact, most of the other cases that
8   have challenged these regulations, that is, that plaintiffs,
9   plaintiffs' plans would currently be providing that coverage
10  to their employees, their employees would currently be able
11  to benefit from that provided coverage.

12       Again, plaintiffs' counsel can correct me if
13  that's wrong, if they're not providing the coverage
14  currently; but that was our understanding.

15       THE COURT:  Do you agree with counsel that the
16  difference in verbiage between the Supreme Court's
17  articulation of the four-prong standard and the Eleventh
18  Circuit's articulation isn't a matter of substance?

19       MR. BERWICK:  I think that would have to be right,
20  Your Honor, because, of course, if there were any conflict
21  between the Supreme Court and the Eleventh Circuit, the
22  Supreme Court's verbiage would presumably control.  Unless
23  the Eleventh Circuit said, "We understand in interpreting
24  the Supreme Court verbiage to mean something else," then I
25  guess the Eleventh Circuit's verbiage would control.

 1              THE COURT:  As far as I can figure out, the
 2  Supreme Court had their verbiage in 2008.  The Eleventh
 3  Circuit has -- both before and after 2008 has the same
 4  formulation without -- I can't say without the citing, but
 5  I'm pretty sure they didn't cite the Supreme Court case.
 6              MR. BERWICK:  So we rely on the verbiage in
 7  Winter, which is the Supreme Court case.
 8              THE COURT:  In what?
 9              MR. BERWICK:  In Winter.
10              THE COURT:  But that's different than the Eleventh
11  Circuit.
12              MR. BERWICK:  Okay.  Your Honor, to be honest, I
13  wasn't aware of that.  If the Eleventh Circuit post-Winter
14  has continued to use the same formulation of the test, I
15  guess this Court is bound by the Eleventh Circuit's test;
16  but I think I agree with plaintiffs' counsel that likely
17  it's just a difference in verbiage and there's really no
18  distinction between the tests.
19              THE COURT:  That's kind of my thought.
20              MR. BERWICK:  That seems like it has to be right,
21  otherwise the Eleventh Circuit's test would seem to not be
22  consistent with the Supreme Court's test.
23              THE COURT:  All right.  Let's get to the case
24  itself.
25              MR. BERWICK:  Sure.  Your Honor, before I address

 1  the legal question at issue today, I thought it might help
 2  to briefly describe the evolution of the contraceptive
 3  coverage regulation, and particularly how the regulations
 4  evolved in an effort to accommodate religious objectives
 5  like plaintiffs raised here today.
 6          I think this will illustrate two things:  Both --
 7  first, that plaintiffs cannot show that they are
 8  substantially burdened by the regulations; and, second,
 9  that plaintiffs have waited far too long to seek the
10  emergency injunctive relief that they seek today.
11          THE COURT:  I think both of those are important
12  questions.
13          MR. BERWICK:  Yes.
14          THE COURT:  I'm going to let you do want you
15  want.  I've read a number of cases, a number of the cases
16  give the history.  I think I'm fairly familiar with that,
17  but go ahead.
18          MR. BERWICK:  Okay.  No, Your Honor, if you
19  think that that's not helpful, then I can just skip over
20  that point.
21          THE COURT:  Just tell me how that impacts the two
22  issues.
23          MR. BERWICK:  Yes.  Sure, Your Honor.  So I'll
24  make it quick.
25          Basically, the point I want to make is that when

1    the government first issued these regulations, they required
2    a wide range of employers to provide contraceptive coverage.
3    That includes for-profit employers like Hobby Lobby.  It
4    includes nonprofit employers like plaintiffs here today.

5              In response to religious objections to that
6    requirement, the government undertook an extensive
7    rulemaking to try to accommodate religious -- entities with
8    religious objections, while still preserving this important
9    benefit for the women who need it.

10             So in February of 2012, the government issued
11   regulations that exempt religious employers; and that's a
12   term of art in this case.  That really refers to primarily
13   churches and other houses of worship.

14             At the same time, the government said for
15   those nonprofit religious organizations with religious
16   objections, you have a temporary safe harbor while we
17   develop accommodations, while we try to accommodate your
18   religious concerns.  So we're going to issue new regulations
19   to do that and in the meantime you are not subject to the
20   requirement.

21             So in July of 2013 that process culminated in
22   the issuance of new regulations that included what I'll call
23   the original accommodation, and under that accommodation
24   nonprofit religious organizations only had to inform their
25   health insurance issuers or their third-party administrators

1  of their objection, at which point the issuers and the
2  third-party administrators had the obligation to separately
3  provide this coverage to those organizations' employees.

4         It would -- that July 2013 regulation stated
5  that the obligation applied to organizations beginning on
6  the start date of the first plan year after January 1st,
7  2014.  So, in other words, at that point plaintiffs were
8  well -- or at least should have been well aware that their
9  plans were going to be required to include contraceptive
10  coverage beginning on or after January 1st, 2014, unless
11  they opted out.  Of course, at that time many, many
12  nonprofit -- well, not many, many -- a significant number
13  of nonprofit organizations filed suit to challenge those
14  rules.

15         On June 30th, 2014, almost a year later,
16  the Supreme Court decided Hobby Lobby.  Although the
17  case, as Your Honor is aware, involved a for-profit
18  employer, a for-profit employer who was subject to the
19  contraceptive-coverage requirement and did not have the
20  option of opting out of that requirement under the
21  accomodation.

22         THE Supreme Court did discuss the accommodation
23  at length in order to -- and in the words of the Court,
24  that accommodation, quote, "Effectively exempts an eligible
25  organization from the contraceptive-coverage requirement."

1    A few days after the Supreme Court decided Hobby
2  Lobby, the Supreme Court decided -- or issued -- I should
3  say issued an order in Wheaton College.  Wheaton College
4  was a case that involved a nonprofit organization like
5  plaintiffs here.  And in that order, the Supreme Court
6  identified an alternative accommodation.  Basically it
7  said Wheaton will be deemed to have complied with the
8  requirements if it just tells the government that it objects
9  to providing this coverage, at which point the government
10  can take steps to ensure that Wheaton College's employees
11  still receive this important coverage.

12    In response to the Wheaton College order, the
13  government issued new regulations shortly thereafter --
14  it was August 27th, 2014 -- essentially augmenting the
15  accommodations and adopting the Supreme Court's alternative
16  accommodation in the regulations.

17    So I think that timeline demonstrates two things,
18  Your Honor.  First of all, plaintiffs could have brought
19  this lawsuit certainly as early as July of 2013.  When they
20  were aware or should have been aware that the accommodations
21  would require their plans to either provide contraceptive
22  coverage or would require them to opt out providing --

23    THE COURT:  Isn't that about the time that
24  Ave Maria did bring a lawsuit and they got hit because of
25  likeness?

1          MR. BERWICK:  No, Your Honor.  Ave Maria brought
2   a lawsuit well prior to July 2013, before the accommodations
3   were -- before the regulations were actually promulgated,
4   before the accommodation even existed.

5          So nonprofit entities that sued in the time
6   period before July 2013, the government did argue, listen,
7   we are in the process of writing new rules in an attempt to
8   accommodate your concerns.  This case, therefore, is not
9   ripe.  You're just not challenging -- you're challenging
10  regulations that don't yet exist.  And the vast, vast
11  majority of courts agreed that, yeah, the government needs
12  to have a chance to actually issue these regulations, at
13  which point you can challenge them.

14         After July 2013, when plaintiffs brought
15  challenges to the accommodations, the government did not
16  argue that they were not ripe.  At that point they were
17  ripe.  There were regulations that plaintiffs could
18  certainly challenge; and these plaintiffs could have
19  challenged the regulations at that time, as many nonprofit
20  organizations did.

21         Let me just make something clear on this point.
22  Plaintiffs' counsel suggested that we're arguing that
23  they waived their right to relief.  That is not what we're
24  arguing.  Plaintiffs -- if plaintiffs can show that they
25  are entitled to relief, they are entitled to relief.  What

1  they -- what we think that their delay does mean is that
2  they can't obtain the emergency injunctive relief they
3  now seek.

4         That does not mean that after this case is
5  litigated on the merits that they would not be entitled
6  to relief, if the Court found that they were.  It just
7  means that -- preliminary injunctive relief is extraordinary
8  relief and a delay of the type that we have here undermines
9  -- I agree with plaintiffs' counsel that it's not
10  dispositive, but it -- I think it undermines their claim to
11  irreparable harm and we've cited in our brief many cases
12  that support that point.

13         THE COURT:  I guess I'm having a little bit of a
14  hard time understanding that.

15         MR. BERWICK:  Sure.

16         THE COURT:  If you're infringing upon -- if
17  as they say you're infringing upon their rights from
18  January 1 through June 1, and they don't file suit, shame
19  on them.  But if they finally get around to filing suit
20  on June 2 and seek a preliminary injunction saying stop
21  infringing, the injunction doesn't say anything about the
22  pre-June 2 conduct.  I can't enjoin conduct that's already
23  taken place already.

24         MR. BERWICK:  Right.

25         THE COURT:  But obviously I can enjoin the

 1  government from keeping doing the same thing.

 2          MR. BERWICK:  I think what the courts that have

 3  addressed this issue have said is that when a plaintiff

 4  sits on their rights for that long -- in other words,

 5  suffers the consequences of the obligation for a long

 6  time before seeking preliminary injunctive relief -- that

 7  undermines any claim that there is irreparable harm, that

 8  a plaintiff cannot sit on their rights and then seek

 9  emergency injunctive relief.

10          That doesn't mean that they wouldn't be entitled

11  to relief at some point.  It's just emergency injunctive

12  relief is an extraordinary remedy.  Plaintiffs have to

13  show that they are irreparably harmed and that a delay

14  in bringing the action undermines the claim that they are

15  irreparably harmed.

16          THE COURT:  You say an emergency.  This really

17  isn't an emergency.

18          MR. BERWICK:  Sorry.  I mean I think preliminary

19  injunctive relief is a form of emergency relief, but I'll --

20          THE COURT:  It's not a TRO.

21          MR. BERWICK:  It's not a TRO, I agree.

22          THE COURT:  Not a full hearing.

23          MR. BERWICK:  I agree.  But courts have --

24  there's no question that courts have said that preliminary

25  injunctive relief is extraordinary relief.

1          THE COURT:  I agree.

2          MR. BERWICK:  And we would argue that courts have

3  said that a delay in seeking such relief undermines a claim

4  of irreparable harm.

5          THE COURT:  Does it undermine the merits?  If it

6  undermines the --

7          MR. BERWICK:  No.  I don't think it undermines

8  the merits.

9          THE COURT:  I guess I don't see why, you know,

10  if it undermines irreparable harm, why shouldn't that be

11  the end of the case?  If that's all I have to find, I can

12  dismiss this case.

13          MR. BERWICK:  I think that's right, Your Honor.

14  I think that Your Honor could deny their request for

15  injunctive relief based purely on the fact that they've

16  waited so long to seek it.

17          THE COURT:  Well, why can't I dismiss the

18  underlying claim, too?  What's the difference?

19          MR. BERWICK:  Because there is no --

20          THE COURT:  They waited so long --

21          MR. BERWICK:  Sorry?

22          THE COURT:  They waited so long under your theory.

23          MR. BERWICK:  Because I don't think the

24  requirement is the same to obtain permanent injunctive

25  relief, Your Honor.  The delay -- at least I don't know